**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSHUA NATHAN, | ) | |
| | ) | |
| Plaintiff, individually and on behalf | ) | Case No. |
| of all others similarly situated | ) | |
| | ) | |
| v. | ) | Class Action Complaint |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | Jury Trial Demanded |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Joshua Nathan, individually and on behalf of all others similarly situated, alleges based upon information and belief and personal knowledge as follows:

### BACKGROUND

1.     Defendant Intel Corporation ("Intel") is the top-selling semiconductor company in the world and manufactures the processors that are used in the most popular personal computers sold in the market.

2.     Intel's success is based, in large part, on its ability to produce some of the fastest central processing units ("CPUs") in the world—a fact that Intel touts in its advertising and on the packaging for the products it sells.

3.     In order to make faster CPUs, Intel took shortcuts. Unfortunately, these shortcuts created a vulnerability or flaw that gives hackers and other cyber criminals the ability to access sensitive, private, and purportedly secure information on every computer that uses an Intel processor that has been manufactured since at least 2004. This major security flaw is referred to as "Meltdown" in the computer industry.

4.     To correct this vulnerability, companies that design operating systems scrambled

1

to develop patches that, while supposedly fixing the vulnerability, will slow down any computer that uses Intel's processors by as much as thirty percent (30%).

5.     Computers that do not have Intel's processors are not affected by the "Meltdown" vulnerability. Accordingly, Intel's representations that its processors are some of the fastest available on the market are demonstrably false because, in order to be secure from Meltdown, the very feature that made the processors fast in the first place, must be fixed.

## THE PARTIES

**A.     Plaintiff**

6.     Joshua Nathan is a citizen and resident of the State of Illinois and bought a Lenovo Yoga 910 computer (notebook) on August 25, 2017 that contained an Intel Core i7 processor.  Mr. Nathan used his computer for personal purposes.  He was unaware of the Meltdown Defect described herein prior to the purchase of his computer. Had Intel disclosed that its CPUs had a major security flaw that would need to be "patched," thus making his computer substantially slower, he would not have purchased the notebook with an Intel processor or would have paid substantially less for it.

**B.     Defendant**

7.     Intel Corporation is a business incorporated under the laws of the State of Delaware with its principal place of business located in Santa Clara, California.  Intel is engaged in the business of designing, manufacturing, distributing, and/or selling computer products, including processors and the defective Intel CPUs that are at issue.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the parties are diverse, and the amount in controversy exceeds $5 million,

excluding interest and costs.

9.      Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District in that the notebook computer was purchased and used in this District.

## FACTUAL ALLEGATIONS

10.     Computers contain microprocessors, also known as the central processing unit (or CPU), which are small chips that reside in computers and other electronic devices.

11.     The CPU handles all basic system instructions, such as processing mouse and keyboard input and running applications.

12.     One of the most important tasks that a CPU must perform is allowing a computer's operating system to interact with the computer's hardware. The CPU does this by dedicating some of its processing power to this task. This dedicated processing memory is known as kernel memory.

13.     Thus, there are two different types of "modes" a computer can be in: the "user" mode and the "kernel" mode.  The user mode is when the user of the computer is inputting commands to perform certain tasks and the kernel mode is when the computer is carrying out the task that the user inputted.

14.     Kernel memory is used for tasks such as writing to a file or opening a network connection. When a software program needs to execute an action, it temporarily hands control of the CPU to the kernel memory to carry out the task.

15.     To make the transition from user mode to kernel mode and back to user mode as fast and efficiently as possible, the kernel is always present, although it is invisible to these programs.

16.     When the kernel is needed, the program makes a system call and the processor switches to kernel mode and uses the kernel memory to complete the task the user wants. When the task is complete, the CPU leaves the kernel memory and allows the computer to accept commands from the user and software again—*to wit*, user mode.

17.     While in user mode, the kernel's code and data remains out of sight but present in the background.

18.     To develop faster and faster CPUs, Intel took shortcuts.  Specifically, Intel designed a flaw that allows low-privilege processes to access memory in the computer's kernel when it should not be allowed to.

19.     This flaw has come to be known as "Meltdown," which was discovered by Jann Horn, a security analyst at the Google-run security research group called Google Project Zero in June 2017[1], but was not made public until on or about January 2, 2018.

20.     The problem with low-privilege processes accessing the kernel is that it essentially gives hackers and the malicious software they develop the ability to spy on computer processes  and, correspondingly, any information maintained on the computer's physical memory. This includes, but is not limited to, passwords, usernames, and other sensitive personal information.

21.     Indeed, online resources have demonstrated that the Meltdown security flaw

---

[1] Cade Metz and Nicole Perlroth, *Researchers Discovery Two Major Flaws in the World's Computers*, The New York Times (Jan. 3, 2018), *available at* https://www.nytimes.com/2018/01/03/business/computer-flaws.html. *See also* Project Zero, Reading Privileged memory with a side-channel (Jan. 3, 2018), https://googleprojectzero.blogspot.com/2018/01/reading-privileged-memory-with-side.html; Lipp, et al., *Meltdown*, https://meltdownattack.com/meltdown.pdf.

could allow hackers to steal passwords in **_real time_**.[2]

22.    Because of the nature of the Meltdown vulnerability, any type of spying by malicious software would not be discoverable on the general logs the computer maintains—thus preventing easy detection of the spying.

23.    To safeguard a computer from the Meltdown security flaw, the operating system[3] must be updated or "patched" with software code. The patch will result in computers with Intel CPUs ignoring the kernel memory inside of Intel microprocessors. This process is known as Kernel Page Table Isolation or "KPTI." KPTI will result in a dramatic slowdown of computing performance—estimated by some to be up to 30 percent.[4]

24.    Leaving a computer vulnerable to hackers is unacceptable and could result in anything from the installation of malware to identity theft. Consumers are left with no choice but to accept the patch to fix the Meltdown security flaw that Intel knew about for over a year (and should have known about for much longer).

25.    But rather than inform consumers about this major security flaw, Intel continued to sell CPUs at a price much higher than consumers would have paid for them had they known about the flaw. Further, Intel sold the CPUs to consumers touting the processors' fast speeds, while the very shortcuts that Intel took to develop its "speedy" processors necessitated a patch that would ultimately slow down processor speeds.

---

[2] Michael Schwarz Twitter Status, "Using #Meltdown to steal passwords in real time #intelbug #kaiser #kpti" (Jan. 3, 2018), https://twitter.com/misc0110/status/948706387491786752.

[3] Operating systems is the software program that runs the computer and all the programs for a user. The major operating systems are: Microsoft's Windows, Apple's Mac OS, Canonical Ltd.'s Ubuntu (a Linux based system).

[4] Rob Thubron, _Massive security flaw found in Intel CPUs, patch could hit performance by up to 30%_, Techspot (Jan. 3, 2018), _available at_ https://www.techspot.com/news/72550-massive-security-flaw-found-almost-all-intel-cpus.html.

26. Indeed, rather than inform consumers about the major security flaw, Intel's Chief Executive Officer Brian Krzanich opted to sell millions of dollars of Intel stock—all that he could part with under the corporate bylaws—after he learned of the Meltdown security flaw. As a result of the stock sale, Krzanich received more than $39 million before the security flaw became public.[5]

27. Accordingly, had consumers known of the Meltdown security flaw, or of the patch needed to guard their vulnerable and sensitive data, they would not have bought the Intel CPUs, or would have paid substantially less for them.

28. Plaintiff and Class members used Intel's products and had business dealings with Intel either directly or indirectly as described above. The acts and practices of Intel have caused Plaintiff and Class members to lose money and property by being overcharged for and paying for the defective CPUs at issue, or being required to purchase an additional CPU not subject to the Meltdown vulnerability. Such loss was the result of the above acts by Intel, and injury to the consumer occurred at the point of sale.

## TOLLING OF APPLICABLE STATUES OF LIMITATION

29. <u>Discovery Rule Tolling</u>. Neither Plaintiff nor the other Class members could have discovered through the exercise of reasonable diligence that their CPUs suffered from a major security flaw within the time period of any applicable statutes of limitation.

30. <u>Fraudulent Concealment Tolling</u>. Throughout the time period relevant to this Action, Intel concealed from and failed to disclose to Plaintiff and the other Class members vital information concerning the Meltdown security flaw described herein. Indeed, Intel has known of

---

[5] Sean Gallagher, *Intel CEO sold all the stock he could after Intel learned of security bug*, ArsTechnica (Jan. 4, 2018), *available at* https://arstechnica.com/information-technology/2018/01/intel-ceos-sale-of-stock-just-before-security-bug-reveal-raises-questions.

the security flaw for over a year, and either knew or otherwise should have known of the flaw in its CPUs well before its discovery by a third party.

31.    Intel kept Plaintiff and the other Class members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiff nor the other Class members could have discovered the security flaw, even upon reasonable exercise of diligence.

32.    Despite its knowledge of the security flaw (and the need to develop a patch to fix it that will significantly slow processing speed), Intel concealed this critical information from Plaintiff and the other Class members, even though, at any point in time, it could have disclosed the issue through individual correspondence, media release, or by other means.

33.    Plaintiff and the other Class members justifiably relied on Intel to disclose the Meltdown vulnerability in the CPUs that they purchased or leased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiff and the other Class members.

34.    Thus, the running of any applicable statutes of limitation have been suspended with respect to any claims that Plaintiff and the other Class members have sustained as a result of the Meltdown security flaw, by virtue of the fraudulent concealment doctrine.

35.    Estoppel.  Intel was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the defective CPUs and Meltdown security flaw, but concealed the true nature, quality, and character of the defective CPUs.

36.    Based on the foregoing, Intel is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

37.    Plaintiff brings this class action claim pursuant to Federal Rule of Civil Procedure 23 on his own behalf, as well as the following Class:

All persons in Illinois who purchased one or more Intel CPUs either from Intel, its authorized retail sellers, or from a computer retailer or manufacturer who installed an Intel CPU inside the customer's computer.

38.     Plaintiff reserves the right to amend or modify the Class definition in connection with a motion for class certification or the result of discovery.

39.     This action has been brought and may properly be maintained on behalf of the Illinois Statewide Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

40.     <u>Numerosity</u>—Federal Rule of Civil Procedure 23(a)(1). The Class is so numerous that joinder of the individual members of the proposed Class is impracticable. The Class includes thousands of persons in Illinois. The precise number and identities of Class members are unknown to Plaintiff at this time, but are known to Intel or can be ascertained through discovery, using records of sales, warranty records, and other information kept by Intel or its agents. Plaintiff does not anticipate any difficulties in the management of this action as a class action. The Class is ascertainable, and there is a well-defined community of interest in the questions of law and fact alleged herein since the rights of each Class member were infringed or violated in similar fashion based upon Intel's uniform misconduct. Notice can be provided through sales and warranty records and publication.

41.     *Commonality and Predominance*—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Questions of law or fact common to the Class exist as to Plaintiff and all Class members, and these common questions predominate over any questions affecting only individual members of the Class. Individual questions, if any, pale by comparison to the numerous common questions that predominate. Among these predominant common questions of law and/or fact are the following:

    a.      Whether Intel's CPUs possess the Meltdown security flaw and the nature of that defect;

    b.      Whether Intel made any implied warranties in connection with the sale of the defective CPUs;

    c.      Whether Intel breached any implied warranties relating to its sale of defective CPUs by failing to resolve the Meltdown security flaw in the manner required by law;

    d.      Whether Intel was unjustly enriched by selling the defective CPUs;

    e.      Whether Intel violated applicable consumer protection laws by selling CPUs with the Meltdown security flaw or by failing to disclose the security flaw, and failing to provide the relief required by law; and

    f.      The appropriate nature and measure of Class-wide relief.

42.    <u>Typicality</u>—Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of the claims of Class members. The injuries sustained by Plaintiff and the Class flow, in each instance, from a common nucleus of operative facts based on Intel's uniform conduct as set forth above. The defenses, if any, that will be asserted against Plaintiff's claims likely will be similar to the defenses that will be asserted, if any, against Class members' claims.

43.    <u>Adequacy</u>—Federal Rule of Civil Procedure 23(a)(4). Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has no interests materially adverse to or that irreconcilably conflict with the interests of Class members and has retained counsel with significant experience in handling class actions and other complex litigation, and who will vigorously prosecute this action.

44.    <u>Superiority and Manageability</u>—Federal Rule of Civil Procedure 23(b)(3).  A

class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy, and individual joinder of all Class members is impracticable, if not impossible, because a large number of Class members are located throughout Illinois. Moreover, the cost to the court system of such individualized litigation would be substantial. Individualized litigation would likewise present the potential for inconsistent or contradictory judgments and would result in significant delay and expense to all parties and multiple courts hearing virtually identical lawsuits. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and the courts, protects the rights of each Class member and maximizes recovery to them.

45.    Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2). Intel has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
(Breach of Implied Warranty)
(on behalf of Plaintiff, individually, and the Class)

46.    Plaintiff hereby incorporates the above allegations in paragraphs 1-45 by reference as if fully set forth herein. Plaintiff asserts this count individually and on behalf of the proposed Class.

47.    Intel and its authorized agents and resellers sold Intel CPUs to Plaintiff and Class members in the regular course of business.

48.    Intel impliedly warranted to members of the general public, including Plaintiff and Class members, these CPUs were of merchantable quality (i.e., a product of a high enough quality to make it fit for sale, usable for the purpose it is made, of average worth in the

marketplace, or not broken, unworkable, damaged, contaminated or flawed), was of the same quality as those generally acceptable in the trade or that would pass without objection in the trade, were free from material defects and were reasonably fit for the ordinary purposes for which they were intended or used. In addition, Intel either was or should have been aware of the particular purposes for which such CPUs are used, and that Plaintiff and the Class members were relying on the skill and judgment of Intel to furnish suitable goods for such purpose.

49.     Pursuant to agreements between Intel and its authorized agents and re- sellers, the stores Plaintiff and Class members purchased their defective Intel CPUs from are authorized retailers and authorized CPU service facilities. Plaintiff and Class members are third-party beneficiaries of, and substantially benefited from, such contracts.

50.     Intel breached its implied warranties by selling Plaintiff and Class members defective Intel CPUs. The Defect renders the Intel CPUs non-merchantable and unfit for their ordinary use or purpose. Intel has refused to recall, repair or replace, free of charge, all Intel CPUs or any of their defective component parts or refund the prices paid for such CPUs.

51.     The Defect in the Intel CPUs existed when the CPUs left Intel's and their authorized agents' and retail sellers' possession and thus is inherent in such CPUs.

52.     As a direct and proximate result of Intel's breach of its implied warranties, Plaintiff and Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale in terms of the difference between the value of the CPUs as warranted and the value of the CPUs as delivered. Additionally, Plaintiff and Class members either have or will incur economic, incidental and consequential damages in the cost or consequences of repair or the replacement cost of buying an additional CPU they would not have purchased had the CPUs in question not contained the non-repairable Defect.

53.    Plaintiff and Class members are entitled to legal and equitable relief against Intel, including damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

**SECOND CAUSE OF ACTION**
(Unjust Enrichment or Quasi-Contract)
(on behalf of Plaintiff, individually, and the Class)

54.    Plaintiff hereby incorporates the above allegations in paragraphs 1-45 by reference as if fully set forth herein. Plaintiff assert this count individually and on behalf of the proposed Class, and in the alternative to any contract- or warranty-based causes of action pursuant to Federal Rule of Civil Procedure 8(d)(2).

55.    As Plaintiff and the Class show just grounds for recovering money paid for benefits Intel received from them, either directly or indirectly, and they have a right to restitution at law through an action derived from the common-law writ of assumpsit by implying a contract at law based on principles of restitution and unjust enrichment, or though quasi-contract.

56.    Intel, having received such benefits, is required to make restitution. The circumstances here are such that, as between the two, it is unjust for Intel to retain such benefit based on the conduct described above. Such money or property belongs to the Plaintiff and Class members and can be traced to funds or property in Intel's possession.

57.    Plaintiff and Class members have unjustly enriched Intel through payments and the resulting profits enjoyed by Intel as a direct result of such payments. Plaintiff's detriment and Intel's enrichment were related to and flowed from the conduct challenged in this Complaint.

58.    By virtue of the purchase and sale of the CPUs in question, Intel alternatively entered into a series of implied-at-law or quasi-contracts that resulted in money being had and received by Intel, either directly or indirectly, at the expense of Plaintiff and Class members.

Plaintiff and other Class members conferred a benefit upon Intel by purchasing one of the defective CPUs. Intel had knowledge of the general receipt of such benefits, which Intel received, accepted and retained. Intel owes Plaintiff and Class members these sums that can be obtained either directly from Intel or its authorized retailers.

59.     Intel should not be permitted to retain the benefits conferred by Plaintiff and Class members via payments for the defective CPUs. Other remedies and claims may not permit them to obtain such relief, leaving them without an adequate remedy at law.

**THIRD CAUSE OF ACTION**
(Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*)
(on behalf of Plaintiff, individually, and the Class)

60.     Plaintiff hereby incorporates the above allegations in paragraphs 1-45 by reference as if fully set forth herein.

61.     Intel engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 815 ILCS 505/2, including but not limited to the following:

      a.     Fraudulently advertising material facts pertaining to the goods marketed and sold to Illinois Subclass members by representing and advertising that their microprocessors would be both secure and perform as advertised; and

      b.     Misrepresenting material facts pertaining to goods marketed and sold to Illinois Subclass members by representing and advertising that their product was both secure and could perform at the speeds advertised.

62.     As a direct and proximate result of Intel's deceptive trade practices, Plaintiff and the Class suffered injuries, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information, and damages, as described above.

63.     Further, as a direct and proximate result of Intel's deceptive trade practices, Plaintiff and the Class suffered injuries as a result of a lack of benefit of the bargain, in paying for Intel CPUs that were slower than advertised as a result of needing a patch to repair the Meltdown security flaw.

64.     Intel's acts caused substantial injury—a loss of benefit of the bargain—that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

65.     Intel knew or should have known that their microprocessors were inadequate to safeguard Plaintiff's and the Class's Personal Information and that risk of a data breach or theft was highly likely, thus necessitating a patch to cure Intel's shortcuts. Intel's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Class.

66.     Plaintiff and Class members seek relief under 815 ILCS 505/10a, including, but not limited to, damages, restitution, punitive damages, injunctive relief, and/or attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
(Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, *et seq.*)
(on behalf of Plaintiff, individually, and the Class)

67.     Plaintiff hereby incorporates the above allegations in paragraphs 1-45 by reference as if fully set forth herein.

68.     While in the course of its businesses, Intel engaged in deceptive trade practices by making false representations, including its representations that its microprocessors were both secure and could perform at its advertised levels, in violation of 815 ILCS 510/2(a)(5), (7).

69.     Intel knew or should have known that its microprocessors would not perform as

advertised and engaged in negligent, knowing, and/or willful acts of deception.

70.     Plaintiff and the Class are likely to be damaged by Intel's deceptive trade practices.

71.     Plaintiff and the Class seek relief under 815 ILCS 510, including, but not limited to, injunctive relief and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and all Class members pray for judgment against Intel as follows:

a.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing the undersigned as Class Counsel, and appointing the Plaintiff as Class Representative;

b.      Awarding Plaintiff and Class members all proper measures of monetary relief and damages, plus interest to which they are entitled;

c.      Awarding equitable, injunctive, and declaratory relief as the Court may deem just and proper, including restitution and restitutionary disgorgement;

d.      Awarding Plaintiff reasonable costs and attorney's fees; and

e.      Granting such further and other relief this Court deems appropriate

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all others similarly situated, demands a trial by jury on all issues so triable.


**DATED**: April 17, 2018                    Respectfully submitted,


                                             **JOSHUA NATHAN,**
                                             Plaintiff

15

By:    /s Jeffrey A. Leon     
        One of His Attorneys
        Jeffrey A. Leon
        QUANTUM LEGAL LLC
        513 Central Avenue, Suite 300
        Highland Park, IL 60035
        T: (847) 433-4500
        F: (847) 433-2500
        jeff@qulegal.com